MENYUK, J.T.C.
Plaintiff operates the website known as drugstore.com through which customers can purchase prescription drugs, over-the-coun *626 ter medicines, and other items typically sold in a drugstore. The issue in this ease is whether defendant Director, Division of Taxation (“Director”) can require plaintiff, an entity that is admittedly physically present in New Jersey, to collect sales tax from New Jersey customers purchasing goods through its website operated from Washington State. Plaintiff asserts that its only roles in the sales transactions were the operation of the website, and the performance of certain administrative functions for its wholly owned subsidiaries. One of those subsidiaries, DS Non-Pharmaceutical Sales, Inc. (“DSNP Sales”) was the nominal retail vendor of the merchandise and had no physical presence in New Jersey. The other subsidiary involved in these transactions was DS Distribution, Inc. (“DS Distribution”), which distributed the merchandise to New Jersey customers from a New Jersey warehouse.
By notice and demand dated February 21, 2002, the Director made an assessment of sales and use tax in the amount of $500,000.[1] Following an administrative protest and conference, the Director issued a final determination on December 17, 2002, finding plaintiff liable for sales tax in the revised amount of $221,626.48, plus penalty and interest, for a total liability of $276,645.27 as of December 13, 2002. No portion of this liability has been paid, and statutory interest continues to accrue. N.J.S.A. 54:49-3.
The Director contends that plaintiff was itself a vendor as defined by N.J.S.A. 54:32B-2(i)(1), a section of the Sales and Use Tax Act, N.J.S.A. 54:32B-1 to -29 (the “Act”), as in effect during calendar years 2000 and 2001 (the “audit period”), and was therefore required to collect and remit sales or use tax on items purchased by and delivered to its New Jersey customers. The Director alternatively maintains that plaintiff was so closely affiliated and identified with its related companies and their activities that the sales of merchandise to New Jersey customers delivered from a New Jersey warehouse must be attributed to plaintiff *627 because it was, effectively, a co-vendor required to collect the tax. See N.J.S.A 54:32B-2(i)(2).
It is plaintiffs position that it made no sales, that its activities in New Jersey were not related to the transactions on which the Director assessed the tax, and that it is therefore not liable for the tax. According to plaintiff, its subsidiary DSNP Sales actually made the sales to New Jersey customers in a drop shipment transaction. See Steelcase, Inc. v. Director, Div. of Taxation, 13 N.J.Tax. 182 (1993). Plaintiff asserts that because DSNP Sales has no physical presence in or nexus with New Jersey, the Director may not assess tax against DSNP Sales and she may not assess plaintiff because it performed no activities in New Jersey to assist DSNP Sales.
For the following reasons, I conclude that plaintiff was a vendor as defined by the Act. I also conclude that the Director's assessment was consistent with the Act and federal law and is therefore affirmed.
I.
Plaintiff is a Delaware corporation formed in 1998 and has its principal place of business in the State of Washington. Plaintiffs primary witness at trial was Alesia Pinney, who was first employed by plaintiff as an associate general counsel in January 1999. In October 2000, she was promoted to vice president, general counsel and corporate secretary.[2]
As related in Ms. Pinney’s testimony, the sales transactions in issue here were structured as follows. Customers accessed an internet website known as “drugstore.com” which is owned and operated by the plaintiff. Plaintiff is also the owner of the trademark name “drugstore.com.” Plaintiff is in the business of *628 providing web-hosting services, which were described by Ms. Pinney as a “kind of bundling of hardware and the creation of software that allows users of the internet to purchase — on line.” Ms. Pinney testified that plaintiffs web-hosting services were analogous to the services of a shopping mall operator who provides a single location where various retailers offer their merchandise and where customers are able to purchase different items from different vendors in a single place. In addition to providing web-hosting services, plaintiff is also in the business of providing administrative services to its subsidiaries involved in the sales transactions in issue. Those services are described in more detail below.
Ms. Pinney testified that the retailer selling the merchandise at plaintiffs “mall” was DSNP Sales, the wholly-owned subsidiary created by plaintiff. DSNP Sales is a Delaware corporation formed in July 1999. According to Ms. Pinney, DSNP Sales offered for sale to customers on the drugstore.com website various items of merchandise of the type carried in drugstores, excluding prescription drugs. When a customer placed an order for such an item through the website — toothpaste, for example — DSNP Sales transmitted that order electronically to another wholly-owned subsidiary created by plaintiff, DS Distribution, also a Delaware corporation formed in July 1999. Ms. Pinney testified that DSNP Sales purchased its merchandise from DS Distribution for resale to DSNP Sales’ customers.
During the audit period, DS Distribution leased from an unrelated third party a building that was located at 407 Heron Drive in Bridgeport, New Jersey, with a mailing address in Swedesboro, New Jersey. The building was used by DS Distribution as a warehouse and distribution facility. Plaintiff guaranteed the lease. According to Ms. Pinney, the landlord required plaintiffs guarantee as a condition of leasing the building to DS Distribution.
Although it appeal's that DS Distribution had other distribution facilities elsewhere in the United States, the transactions on which tax was assessed by defendant involved solely merchandise distributed from the New Jersey warehouse by DS Distribution to *629 customers also located in New Jersey. When DS Distribution received an order from DSNP Sales, employees of DS Distribution would pick the items of merchandise ordered from its inventory at the New Jersey facility, package the order and transmit it by common carrier to the customer in New Jersey.
According to plaintiff, plaintiff and its various subsidiaries had the following functions in connection with the sales transactions on which tax was assessed:
drugstore.eom
(plaintiff)
Operated website in Washington State through which DSNP Sales sold merchandise to New Jersey customers; no employees in New Jersey performing activities on behalf of either DSNP Sales or DS Distribution
DSNP Sales
Located solely in Washington State; took retail orders from New Jersey customers via the drugstore.com website; purchased merchandise from DS Distribution for resale to its New Jersey customers and directed DS Distribution to ship that merchandise directly to New Jersey customers
DS Distribution
Received orders in New Jersey from DSNP Sales for purchase of merchandise for resale to New Jersey customers; at the direction of DSNP Sales, shipped that merchandise directly to New Jersey customers from its New Jersey warehouse
The agreements among plaintiff and its two wholly-owned subsidiaries, DSNP Sales and DS Distribution, and Ms. Pinney’s testimony disclosed that the actual functions of the three entities in connection with the sales transactions on which tax was assessed differed from the foregoing representation. Significantly, Ms. Pinney’s testimony disclosed that DSNP Sales had no employees. Her testimony, considered together with the documentary evidence produced at trial, revealed that the various activities said to have been performed by DSNP Sales in connection with the sales transactions were actually distributed as follows:
*630 drugstore.com
(plain tiff)
Operated website in Washington State through which merchandise was sold to New Jersey customers; had employees and equipment at the New Jersey warehouse. From its offices in Washington State, it ordered merchandise from DS Distribution on behalf of DSNP Sales; processed credit card transactions for DSNP Sales; ordered and paid for merchandise from manufacturers and distributors in its own name for delivery to DS Distribution; handled accounting for itself and its subsidiaries; provided legal advice and services to DSNP Sales and DS Distribution through its general counsel.
DSNP Sales
No physical presence anywhere; no employees anywhere; contracted all of its administrative and purchasing functions to plaintiff; contracted its distribution functions to DS Distribution.
DS Distribution
Employees and property in New Jersey; received and stocked merchandise ordered on its behalf by plaintiff; at the direction of plaintiff, picked orders and distributed them to New Jersey customers;
The relationship between plaintiff and DSNP Sales was controlled by at least three separate written agreements: a website hosting agreement, a service and support agreement and a trademark license agreement, all dated December 27, 1999. All three agreements were signed on behalf of both plaintiff and DSNP Sales by David Rostov, the chief financial officer of both corporations. The relationship between DSNP Sales and DS Distribution was governed by a distribution and fulfillment agreement also dated December 27, 1999, and also signed by Mr. Rostov as chief financial officer of both corporations. Finally, there were two agreements between plaintiff and DS Distribution: a services and support agreement and a trademark and licensing agreement, both dated December 27, 1999 and both signed by Mr. Rostov as chief financial officer of both corporations.
According to Ms. Pinney, she was responsible for preparing and managing the drafting of these documents. Ms. Pinney provided her legal services to DSNP Sales and DS Distribution as part of *631 the administrative services provided by plaintiff to its subsidiaries under the service and support agreements.
Under the trademark license agreement between them, plaintiff granted DSNP Sales a license to use various trademarks owned by plaintiff, including “drugstore.com.” Under the web-hosting agreement, plaintiff agreed to provide web-hosting services to DSNP Sales under the domain name drugstore.com, with DSNP Sales to have a designated, prominently identified area available directly from the drugstore.com website. The name used by DSNP Sales on the website was the name “drugstore.com” that had been licensed to it by plaintiff. DSNP Sales was obligated under the web-hosting agreement to supply the actual content of its area on the website (including all text, copy, editorial, images and so forth). However, under the services and support agreement between plaintiff and DSNP Sales, plaintiff agreed to supply DSNP Sales with technology and content. Accordingly, notwithstanding the nominal obligation of DSNP Sales under the website hosting agreement to supply content for the website, DSNP Sales outsourced this obligation to plaintiff.
Under the same services and support agreement, plaintiff agreed to provide DSNP Sales with advertising, promotions, other marketing, customer care, information technology, general and administrative services, accounts payable management, payroll services, accounts receivable management, and other services that the parties might agree to from time to time, whether or not in writing. Plaintiff verified and processed credit card information and collected payments from customers ordering merchandise on behalf of DSNP Sales.
In the distribution and fulfillment agreement between DS Distribution and DSNP Sales, DSNP Sales was designated as DS Distribution’s “exclusive online representative,” and DS Distribution was designated as the exclusive provider to DSNP Sales of procurement, distribution, and customer support services (excluding customer care).[3] As the exclusive provider of procurement *632 services for DSNP Sales, DS Distribution agreed to purchase inventory in accordance with DSNP Sales forecasts, to stock inventory to be sold by DSNP Sales at either of two DS Distribution Fulfillment Centers, one of which was the warehouse and distribution facility operated by DS Distribution in New Jersey. Significantly, the agreement specifically provided that title to the products would remain with DS Distribution until shipped to the customer. Notwithstanding this provision, DSNP Sales provided DS Distribution with a multi-jurisdictional resale certificate which certified that the merchandise being purchased by DSNP Sales from DS Distribution was for resale in the normal course of business, and that DSNP Sales was registered with the State of Washington, where the merchandise would be delivered to DSNP Sales for resale.
The distribution and fulfillment agreement between DS Distribution and DSNP Sales also provided: “The web site will at all times appear seamless to the customer, such that there is no apparent distinction between DS Distribution and DSNP Sales.” (emphasis added). The website did, in fact, appeal’ seamless, and gave no indication that an entity other than “drugstore.com” was the seller of the merchandise offered. Contrary to Ms. Pinney's analogy of the website as a shopping mall where a directory would identify various retailers, the appearance of the website was more akin to the directory of a single store, namely “drugstore.com,” which guided a customer to the aisle within the store where a particular category of merchandise was located. This conclusion is confirmed by plaintiffs Form 10-K for the fiscal year ended January 2, 2000 filed with the Securities and Exchange Commission, which describes “shopping at drugstore.com” as follows:
Shoppers at drugstore.com see a home page that highlights our five product departments, as well as editorial content and promotions. A shopper can browse through the store by clicking on the permanently displayed department names, move directly to a department’s home page and view promotions and featured products. All product lists allow a shopper to select products based on brand or unique attributes of the category, such as tartar control or whitening for toothpaste, or color for lipstick or eye shadow. Shoppers can also search the site by entering text in the search box at the top of any page.
As evidenced by a sales order for non-pharmaceutical merchandise placed by a Division of Taxation employee over the drug *633 store.com website for delivery to him in New Jersey, all communications to the purchaser came from “drugstore.com,” including an e-mail message acknowledging the order, and instructions for return of unsatisfactory merchandise to “drugstore.com” at the New Jersey warehouse and distribution facility mailing address. The invoice for the merchandise was also in the name of “drugstore.com.” The single piece of evidence identifying for the consumer the name DSNP Sales as a separate entity was an invoice in the name of “drugstore.com,” which contained the following in an inconspicuous place on the bottom of the reverse side:
Corporate Information:
All GNC-branded product sales are made on behalf of General Nutrition Companies, Ine., and its subsidiaries. All other sales are made on behalf of DS Non-pharmaceutical Sales, Inc.
The “seamless” website was actually designed and implemented by plaintiff, and not DSNP Sales pursuant to the website hosting agreement between the two corporations. Similarly, plaintiff also transmitted orders received over the website so that DSNP Sales’ obligations under its agreement with DS Distribution were actually performed by plaintiff. Ms. Pinney further testified that plaintiff provided “inventory management services” for DS Distribution and actually ordered from third party manufacturers the merchandise that was shipped to DS Distribution facilities (including the one in New Jersey), for fulfillment of orders placed with DSNP Sales and distributed by DS Distribution to customers placing orders over the drugstore.com website.
Under the services and support agreement between plaintiff and DSNP Sales and under a similar services and support agreement between plaintiff and DS Distribution, the plaintiff was responsible for accounts receivable and made payments to the suppliers of the merchandise sold on the website. It also managed any payments due under the various inter-company agreements. No checks were actually issued in connection with inter-company transactions. Ms. Pinney testified that transactions among the drugstore.com affiliated corporations are “zeroed out or trued up” on a quarterly basis. By way of example, she stated *634 that if plaintiff owed money to DSNP Sales, then plaintiffs investment in DSNP Sales would be reduced by the amount owed by deducting that amount from plaintiffs capital account on the books of DSNP Sales. Conversely, if DSNP Sales owed plaintiff money, plaintiffs capital account in DSNP Sales would be increased. Ms. Pinney testified that this amounted to the exchange of value from one entity to the other, and has the effect of reflecting the book value of each entity, which is one of the ways to value a company in the event of its sale.
According to Ms. Pinney, this was significant because plaintiff was created for the purpose of “leveraging the Internet.” She testified that a separate subsidiary was set up for each line of business so that each could be “monetized” by spinning it off or selling it or combining it with another business. DSNP Sales was set up to sell over-the-counter drag and personal care items. DS Distribution was set up as a wholesale distributor. Another subsidiary not implicated here, Beauty.com Sales, sells prestige beauty products over the Internet. DS Pharmaceutical Sales is a subsidiary operating as a pharmacy selling prescription drugs. Ms. Pinney testified that there was an initial concern that the sale of prescription drugs carried certain liability risks, which was an additional reason that the subsidiary selling prescription drugs was set up as a separate entity. Ms. Pinney denied that tax minimization played a role in determining to organize several corporations for the purpose of selling and distributing non-pharmaceutical merchandise.
Plaintiff concedes that it had employees of its own working in the New Jersey facility. A pharmacy affiliated with DS Pharmaceutical Sales was also located in the New Jersey warehouse and distribution facility. Ms. Pinney testified that plaintiffs New Jersey employees were connected with the prescription drug operation and not with the distribution of the merchandise on which tax was assessed in this case. However, during discovery, plaintiff produced lists identifying plaintiffs employees working at the New Jersey warehouse during the audit period by job function. One of those persons was listed as an over-the-counter order *635 researcher. Ms. Pinney testified that the listing was an error. Jacqueline Riggs, the senior director of operations for DS Distribution at the New Jersey warehouse, testified that no one on the lists had been employed by DS Distribution. The schedules did not, however, purport to identify employees of DS Distribution but only employees of plaintiff.
Plaintiff also concedes that it leased equipment for use in New Jersey, although it was again Ms. Pinney’s testimony that the equipment was used by plaintiff’s employees in the processing of prescription drug sales, but was not used in connection with the sale of non-prescription items being distributed by DS Distribution from the New Jersey warehouse. When she was asked how she knew that the equipment located in New Jersey was not being used to support the non-prescription operations of DS Distribution, Ms. Pinney stated that one of the items of equipment in New Jersey was a scanner. According to Ms. Pinney, scanners are used in pharmacy operations to scan prescriptions in order to keep a record of them. However, Ms. Riggs testified that DS Distribution also used scanners when packing an order for DSNP Sales. As pointed out on cross-examination during Ms. Finney’s rebuttal testimony, Ms. Pinney could not identify the purpose of some of the equipment leased by plaintiff and used in New Jersey and could not state which company’s books listed as assets certain equipment located at the New Jersey facility.
Ms. Pinney also testified that, for the years in issue, there was some overlap of the officers of DSNP Sales, DS Distribution, and plaintiff. Ms. Pinney testified, for example, that she was an officer of all three corporations. Ms. Pinney also testified that the chairman of plaintiff’s board of directors during the audit period (Peter Neupert) “happened to be” the sole board member of both DS Distribution and DSNP Sales during the same time period. Christopher Hauser was plaintiff’s vice president of operations, but was also employed by DS Distribution, and was the person to whom Ms. Riggs reported in connection with the operation of the New Jersey warehouse.
*636 II.
The Act[4] imposes the sales tax on the receipts from every retail sale of tangible personal property, except as otherwise provided by the Act itself. N.J.S.A. 54:32B-3(a). The Act also imposes a use tax for “use within this State ... of any tangible personal property purchased at retail....” N.J.S.A. 54:32B-6. “Retail Sale” is defined in pertinent part as “[a] sale of tangible personal property to any person for any purpose, other than (A) for resale ... as such.” N.J.S.A. 54:32B-2(e)(1). Vendors[5] of tangible personal property are charged with collecting the sales or use tax from the customer when collecting the sales price, as trustee for and on account of the State. N.J.S.A. 54:32B-2(w) (defining “[p]ersons required to collect tax” to include vendors); see also N.J.S.A. 54:32B-12(a).
During the audit period, the term “vendor” was defined by N.J.S.A. 54:32B-2(i), in relevant part, as including:
(1) (A) A person making sales of tangible personal property or services, the receipts from which are taxed by this act;
(B) A person maintaining a place of business in the State and making sales, whether at such place of business or elsewhere, to persons within the State of tangible personal property or services, the use of which is taxed by this act;
(C) A person who solicits business either by employees, independent contractors, agents or other representatives or by distribution of catalogs or other advertising matter and by reason thereof makes sales to persons within the State of tangible personal property or services, the use of which is taxed by this act;
(2) In addition, when in the opinion of the director it is necessary for the efficient administration of this act to treat any salesman, representative, peddler or canvasser as the agent of the vendor, distributor, supervisor or employer under whom he operates or from whom he obtains tangible personal property sold by him or for whom he solicits business, the director may, in his discretion, treat such agent as the vendor jointly responsible with his principal, distributor, supervisor or employer for the collection and payment over of the tax.
*637 This definition was amended by L. 2006, c. 44, § 1, to add the following to the end of subparagraph (2), above:
A person is an agent of a seller in all eases, but not limited to such cases, that: (A) the person and the seller have the relationship of a “related person” described pursuant to section 2 of P.L. 1993, e. 170 (C.54:10A-5.5); and (B) the seller and the person use an identical or substantially similar name, tradename, trademark, or goodwill, to develop, promote, or maintain sales, or the person and the seller pay for each other’s services in whole or in part contingent upon the volume or value of sales, or the person and the seller share a common business plan or substantially coordinate their business plans, or the person provides services to, or that inure to the benefit of, the seller related to developing, promoting, or maintaining the seller’s market.
The Legislature provided that the foregoing amendment was to remain inoperative until July 15, 2006. L. 2006, c. 44, § 20. Neither party asserts that the amendment was intended to be applied retroactively.
Plaintiff contends that it did not make the sales that were the subject of the Director’s assessment and that it is therefore not a vendor under the Act. It further asserts that DSNP Sales was the actual vendor, and that DSNP Sales was based in Washington State and did not operate in New Jersey. Plaintiff therefore concludes that the Director may not require DSNP Sales to collect sales tax because that corporation did not have a substantial nexus with New Jersey. See Quill Corp. v. North Dakota, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). In Quill, the issue was whether North Dakota could require a mail-order retailer with no outlets or sales representatives in the state to collect a use tax from its customers on merchandise purchased for use within the state. Quill re-affirmed the United States Supreme Court’s earlier holding in National Bellas Hess, Inc. v. Department of Revenue of Illinois, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), concluding that a retailer had to have a physical presence in the taxing jurisdiction before it could be required to collect sales and use taxes. Quill, supra, 504 U.S. at 317, 112 S.Ct. at 1916, 119 L.Ed.2d at 110. Plaintiff further asserts that, since it did not perform any activities in support of DSNP Sales in New Jersey, no liability for the collection of tax can be attributed to it.
Plaintiff maintains that the sales made by DSNP Sales were drop-shipment transactions, whereby the retailer (DSNP Sales) *638 sells merchandise to a customer without taking possession of it and the wholesaler (DS Distribution) or manufacturer directly delivers the merchandise to the retailer’s customers. See Stryker Corp. v. Director, Div. of Taxation, 168 N.J. 138,144, 773 A.2d 674 (2001). In other words, a drop-shipment transaction is correctly analyzed as two separate sales transactions: first a sale from a manufacturer or distributor to a retailer, and second a sale from the retailer to the consumer. See Steelcase, Inc. v. Director, Div. of Taxation, supra, 13 N.J.Tax at 193.
In Steelcase, the issue was whether an out-of-state manufacturer was obliged to collect New Jersey sales tax on office furniture purchased from the manufacturer by an independent dealer (the selling dealer) also located outside of New Jersey, where the selling dealer gave the manufacturer instructions to ship the goods to New Jersey, either directly to the selling dealer’s New Jersey customer, or to a New Jersey dealer (the installing dealer) who was located closer to the customer’s New Jersey location and who would arrange for installation of the office furniture in New Jersey, or to the manufacturer’s New Jersey warehouse. Id. at 185-86. Under the terms of the sales agreements between the manufacturer and the selling dealers, the dealers took title to the furniture when it was delivered by the manufacturer to the common carrier at shipping points located outside New Jersey. Title was in the dealer during transit. Dealers gave the manufacturer sale-for-resale exemption certificates of the state in which their dealership was located. Id. at 186.
The Tax Court recognized that a combination of physical presence in New Jersey and the transfer of possession in New Jersey is sufficient to impose on the vendor an obligation to collect the sales and use tax in a two-party transaction. Id. at 188. However, in a three-party transaction, if the vendor has no physical presence in New Jersey, it has no obligation to collect sales or use tax. Id. at 189.
In Steelcase, supra, the first sale from the manufacturer to the out-of-state dealer was a sale for resale, and thus exempt. N.J.S.A. 54:32B-2(e)(1). The second sale was by an out-of-state *639 vendor to a New Jersey customer. Because the out-of-state vendor (the selling dealer) had no physical presence in New Jersey, it was not obligated to collect sales tax from its customer. The court regarded the tax assessment in issue as an impermissible attempt by the Director to “telescope these two separate transactions” into a single sale by the manufacturer to the New Jersey customer in order to impose an obligation on the manufacturer to collect either a sales tax or a use tax on the transactions. Steelcase, supra, 13 N.J.Tax at 193.
Plaintiff contends that the transactions in issue here are precisely analogous, with DSNP Sales being the out-of-state vendor that sells merchandise to customers in New Jersey and purchases the merchandise from DS Distribution, which delivers the products to DSNP Sales’ customers in New Jersey. Plaintiff asserts that because the actual sale transaction is between DSNP Sales and the New Jersey customer, DSNP Sales cannot be compelled to collect the New Jersey sales tax and plaintiff cannot be compelled to do so either, because it is not a vendor at all and it is not an agent for or representative of DSNP Sales in New Jersey.
Plaintiff’s argument that the sales transactions in Steelcase and the sales transactions in issue here are essentially the same and should be treated identically for sales tax collection purposes is not persuasive. Unlike the network of independent dealers in Steelcase, the corporations here are all related. Both DS Distribution and DSNP Sales are wholly owned by plaintiff.
Most significantly, there was no actual sale of merchandise by DS Distribution to DSNP Sales. During the audit period, the Act defined “sale” as “[a]ny transfer of title or possessiom or both, exchange or barter, rental, lease or license to use or consume, conditional or otherwise, in any manner or by any means whatsoever for a consideration, or any agreement therefor ....” (emphasis added) N.J.S.A. 54:32B-2(f).
The distribution and fulfillment agreement provided that title to the products plaintiff claims were purchased by DSNP Sales from DS Distribution would remain with DS Distribution until shipped to the customer. When asked on cross-examination what it meant *640 when an entity had title to the products, Ms. Pinney responded that it meant that the entity owned them. When asked if DS Disti’ibution owned the products when shipped to the customers, Ms. Pinney responded, “yes.” Only on re-direct examination did Ms. Pinney attempt to clarify this statement by testifying that it was her intent and understanding that for “an instant, a flash it [that is, title] went [from DS Distribution] to DS Non-pharmaceutical Sales, Inc. and then to the consumer.” I find this statement to be self-serving and incredible. Even if true, such a transfer directly contradicts the terms of the uniform sales and use tax resale exemption certificate signed by Ms. Pinney under penalties of perjury on behalf of DSNP Sales. The certificate represents that DSNP Sales is registered in Washington State “within which your firm [DS Distribution] would deliver purchases to us” for resale. There was no transfer of either title to or possession of goods in Washington State. The only event that happened in Washington State was the making of notations on the books of DSNP Sales and DS Distribution.
The evidence shows that DS Distribution did not invoice DSNP Sales charging it for the goods said to have been purchased from it. Rather, plaintiff was the only entity issuing inter-company invoices. All of the invoices bore the name “drugstore.com.”
Not only was there no transfer of title or possession from DS Disti’ibution to DSNP Sales, there was no consideration paid by DSNP Sales to DS Distribution for the merchandise. No money ever changed hands. Inter-company transactions were “zeroed out or trued up” on a quarterly basis, by additions to or subtractions from plaintiffs paid-in-capital account in each subsidiary. According to Ms. Pinney, this method reflected the relative book values of each entity in plaintiffs corporate family.
Plaintiff emphasizes that New Jersey recognizes the principle that “the corporate form as a wholly distinct and separate entity will be upheld” and that the party seeking to disregard the corporation “has the burden of proving ‘misuse of the corporate form and the necessity of disregarding it.’ ” Coppa v. Director,
*641 Div. of Taxation, 8 N.J.Tax 236 (1986), citing Kugler v. Koscot Interplanetary, Inc., 120 N.J.Super. 216, 253-55, 293 A.2d 682 (Ch.Div.1972). But see Estate of Swensen v. Director, Div. of Taxation, 12 N.J.Tax 558 (1992), which cited Coppa for the following proposition:
[T]he Tax Court found that a corporation must engage in a ‘minimum of purposeful business activity’ to substantiate a claim that it exists as a bona fide corporation. While the parameters of legitimate business activity are relatively flexible, tax avoidance by use of the corporate form does not rise to the level of a bona fide business purpose.
[Id. at 566 (citations omitted).]
This is not a case of disregarding a corporate entity. Rather, it is a case of disregarding sales transactions that plaintiff claims were made by DS Distribution to DSNP Sales. The Director is not required to “acquiesce in and blindly accept the label that a taxpayer places on a transaction.” Centex Homes of New Jersey v. Director, Div. of Taxation, 241 N.J.Super. 16, 17, 574 A.2d 448 (App.Div.1990); Kushner v. Director, Div. of Taxation, 22 N.J.Tax 353, 365 (2005). It is not what plaintiff did on paper or what its general counsel testified it did that determines whether plaintiff was obliged to collect sales tax. It is the actual conduct of the sales transactions that results in that determination. The testimony of plaintiffs principal witness was not credible and did not accurately reflect how sales transactions took place as revealed by the other trial evidence.
I have already concluded that there was no transfer of title or -possession from DS Distribution to DSNP Sales and that a resale certificate purportedly evidencing the exempt nature of the sales from DS Distribution to DSNP Sales did not accurately describe the sales transactions. As a further basis for concluding that DSNP Sales never purchased the merchandise for resale, however, I find the reasons advanced by Ms. Pinney for the formation of DSNP Sales as a separate subsidiary neither credible nor convincing.
Ms. Pinney emphasized that the plaintiffs founders wanted to be free to spin-off or sell the various lines of business, noting that plaintiff and its subsidiaries do not have change-of-control provisions or anti-take-over provisions in their corporate charters. In *642 the case of DSNP Sales, however, there was nothing to sell or spin-off. It had no employees and contracted out all of the functions of a retail seller to plaintiff or to DS Distribution. Its value was in its relationships with plaintiff and its affiliates. For example, its most valuable asset was probably the right to use the drugstore.com name. But by its own terms, the trademark and licensing agreement between plaintiff and DSNP Sales granting DSNP Sales that right, would terminate in the event that the majority of DSNP Sales’ voting stock was no longer owned directly or indirectly (through its subsidiaries) by plaintiff. The term of the web-hosting agreement between plaintiff and DSNP Sales was “co-extensive” with that of the trademark agreement. If either agreement was teiminated, the other agreement would terminate at the same time. Similarly, the sendees and support agreement between plaintiff and DSNP Sales would terminate if a majority of DSNP Sales’ voting securities ceased to be owned directly or indirectly by plaintiff. Finally, the distribution and fulfillment agreement between DSNP Sales and DS Distribution provided for termination of the agreement in the event that a majority of DSNP Sales’ voting stock was not owned directly or indirectly by plaintiff.
In other words, there would be no reason for a third party to purchase DSNP Sales because in the event of its sale that entity would be left with nothing but a certificate of incorporation. Further, insulation from liability between lines of business, another reason cited by Ms. Pinney, was a principle concern in connection with the sale of prescription drugs, but Ms. Pinney did not indicate that it was an important consideration with respect to the sale of non-pharmaceutical items. Plaintiffs founders were already insulated from liability for sales of non-pharmaceutical items by the formation of the plaintiff corporation.
The last reason cited by Ms. Pinney for the creation of a separate entity for each line of business was to allow flexibility in entering into contractual relationships with third parties. The only example given by Ms. Pinney for this need related to a potential business opportunity to host a website for an unrelated seller of high-end beauty products that was never realized. Ac *643 cording to Ms. Pinney, however, “those discussions would never have happened had ... all the operations of the business been put into one [entity].” It was Ms. Pinney’s belief that this third party would not want to be in a relationship with an entity such as DSNP Sales that sold mass market beauty products. She did not explain why such a third party would find acceptable a relationship with plaintiff whose trademark name was used by the subsidiary-DSNP Sales — said to be theoretically objectionable to the third party, and where plaintiff performed virtually all of DSNP Sales’ functions, except for the packaging and shipping of its order's, which were performed by yet another of plaintiffs subsidiaries, DS Distribution.
None of Ms. Pinney’s testimony regarding the corporate purpose of DSNP Sales was supported by minutes of board meetings or internal memoranda or other' documentary evidence. I can only conclude that the reason for the formation of DSNP Sales was to bolster the claim that plaintiff was merely the operator of a website and was not involved in the sale of merchandise. This was accomplished by positioning DSNP Sales between plaintiff and DS Distribution as the retail seller in sales transactions that commenced with a consumer purchase made through the drugstore.com website and concluded with the delivery of merchandise to the customer in New Jersey.
After reviewing all the testimony and evidence, I conclude that the sales on which the Director assessed tax were properly characterized as having been made by plaintiff to its New Jersey customers, and that plaintiff was the actual vendor. N.J.S.A. 54:32B-2(i)(1)(B). Plaintiff received orders over its website in Washington, and transmitted those orders to DS Distribution with instructions for delivery to customers.
I also conclude that DS Distribution was the actual distributor of the products. It leased its own warehouse in New Jersey (although the lease was guaranteed by plaintiff), and it had its own employees picldng, packing, and shipping orders as instructed by plaintiff. It had possession of the merchandise that was sold to New Jersey customers.
*644 However, as evidenced by a purchase order issued by plaintiff to one of the suppliers of products carried on its website and a corresponding invoice from that supplier to plaintiff, plaintiff ordered the inventory in its name. Although plaintiff contends that these activities were performed by plaintiff on behalf of DS Distribution under the distribution services and support agreement between them, the name “DS Distribution” appears nowhere on either the purchase order or the invoice. As between the supplier and plaintiff, at least, it was plaintiff that was purchasing the merchandise, with instructions to deliver it to “drugstore.com” in New Jersey.
Plaintiff concedes that it had nexus with New Jersey and it is plain that it had a substantial physical presence in New Jersey. I find that at least some of the equipment leased by plaintiff and located at the New Jersey warehouse was used by DS Distribution in picking, packing, and shipping non-pharmaceutical products and that some was used in support of the operation of the building as a whole. As indicated above, I found Ms. Pinney’s testimony on this point incredible.
Plaintiff also had employees in New Jersey. According to Ms. Pinney, these employees were used in connection with the pharmacy operation only. The New Jersey employee lists and the corresponding job descriptions provided to the Director in discovery, however, plainly indicated that at least one of plaintiffs employees was an over-the-counter order researcher and was not involved in the pharmacy operations. Ms. Pinney characterized this as a mistake. Ms. Riggs said that none of the employees on the lists were employed by DS Distribution. The point is, however, that the employee was listed as plaintiffs employee, and plaintiff never amended its discovery to correct what Ms. Pinney testified was a mistake. Finally, it is worth noting that on its corporation business tax returns for the years 2000 and 2001, plaintiff reported that it maintained a permanent and continuous place of business in New Jersey, namely, the warehouse in Bridgeport, New Jersey.
*645 It is true that plaintiffs sales activities did not take place in New Jersey. It operated its website in Washington State. It accepted sales orders there and not in New Jersey. However, N.J.S.A. 54:32B-2(i)(1)(B) defines a vendor as, among other things, a person maintaining a place of business in this State and making sales of property taxed by the Act, whether or not the sale takes place within or without the State. The United States Supreme Court in National Geographic Society v. California Bd. of Equalization, 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977), cited with approval in Quill, supra, 504 U.S. at 311, 112 S.Ct. at 1912, 119 L.Ed.2d at 106, upheld an assessment of tax against National Geographic on its mail-order sales of maps, atlases and other merchandise to California residents. National Geographic did not conduct any activities in California in connection with the sale of these items, but maintained two offices there that solicited advertising copy for the National Geographic monthly magazine. The Supreme Court concluded that the “maintenance of the two offices in California and activities there adequately establish a relationship or ‘nexus’ between [National Geographic] and the State that renders constitutional the obligations imposed....” Id. at 556, 97 S.Ct. at 1390, 51 L.Ed.2d at 637.
For the foregoing reasons, I conclude that plaintiff was the vendor of the merchandise sold to New Jersey customers and, consistent with Quill, supra, 504 U.S. at 315, 112 S.Ct. at 1914-15, 119 L.Ed.2d at 108, it meets the bright line test of physical presence in New Jersey. It is therefore liable for collection of the tax from the customer. The Clerk of the Tax Court is directed to enter judgment affirming the Director’s assessment.

 Plaintiff did not file any sales and use tax returns and the assessment appears to have been an arbitrary assessment made pursuant to N.J.S.A. 54:49-5.

 Ms. Pinney testified that she was promoted in July 2000. However, the parties had stipulated that Mark L. Silverman was vice president, general counsel and corporate secretary through October 6, 2000, and that Ms. Pinney was associate general counsel through that same date. I conclude from this stipulation that Ms. Pinney was mistaken in her testimony, and that she was not promoted to general counsel until October 2000.

 Customer care services were provided to DSNP Sales by plaintiff pursuant to the services and support agreement between plaintiff and DSNP Sales.

 Except where noted, the quotations from and citations to the Act are from the Act as it was in effect during the audit period. The Act was substantially amended by L. 2005, c. 126 to conform it with the Streamlined Sales and Use Tax Agreement. See Assembly Budget Committee, Statement to A. 3473, later enacted as L. 2005, c. 126.

 The term "vendor” was replaced by the term "seller" after the audit period in issue here. See L. 2005, c. 126, § 1.