BRENNAN, J.T.C.
This constitutes the court’s opinion after trial in the above-referenced matter. The dispute at issue is whether the plaintiff, Village Super Market of PA, Inc., (“PA”) is subject to New Jersey Corporation Business Tax (“CBT”) pursuant to N.J.S.A. 54:10A-1 for the period of October 28, 1999 to the present. The defendant, Director, Division of Taxation (“Director”), asserts that PA has nexus with New Jersey and that its business is integrally related to a New Jersey business by virtue of its limited partnership interest in a New Jersey entity.
For the reasons set forth below, the court finds that PA has nexus with New Jersey and is subject to CBT.
*398 I. STATEMENT OF FACTS
In 1937, two immigrant brothers, Nicholas and Perry Sumas, opened a produce stand in the Village of South Orange in New Jersey. After World War II, the two brothers joined a food cooperative, now known as Wakefern Corporation (“Wakefern”), for the purpose of purchasing grocery items in bulk so that they could enjoy the cost savings of economies of scale and compete with large grocery chains.[1] Eventually the cooperative members of Wakefern began to trade under the name of ShopRite.[2]
The business was a success and a decision was made to incorporate. On December 29,1954, the two brothers and Nicholas’s son, James Sumas, formed Village Super Market, Inc. (“INC”), a New Jersey corporation whose principal place of business was located at 15 South Orange Avenue in the Village of South Orange, New Jersey.
In 1965, INC amended its Certificate of Incorporation to authorize the issuance of Class A Common Stock. Since then, INC has been publicly traded on NASDAQ with the majority of the stockholders' being members of the Sumas family. Eventually, INC moved its principal place of business to its current location in Springfield, New Jersey.
By 1999, INC owned and operated twenty-six ShopRite supermarkets in New Jersey and Pennsylvania. The stores were divided into five districts, with each district having a manager and several supervisors. That year, INC decided to reorganize its business structure. As stated in INC’s October 24, 1999 Resolution:
*399 [T]he Directors believe it is in the best interest of the Corporation to restructure its business into separate legal entities in order to separately conduct its New Jersey and Pennsylvania operations. This restructuring will result in the transfer of assets and employees to the newly created entities. The separation of assets and employees into two distinct entities is intended to result in isolation of income generated from New Jersey and Pennsylvania operations due to separate accounting of the different entities. Further, the new corporate structure is intended to create a more flexible corporate structure for future changes in the company’s operations, such as expansion into new business segments through future acquisitions or dispositions. In addition, the restructuring plan is intended to provide for flexibility to permit and utilize a more efficient tax structure, resulting in improved cash flow.
The restructure led to the creation of two additional entities.

A. Village Super Market of PA, Inc.

On October 20, 1999, INC formed PA as a wholly owned subsidiary. PA incorporated in the state of Pennsylvania and INC contributed one hundred dollars to PA in exchange for one-hundred percent of PA’s stock. Since its formation, PA has owned, operated, and managed a ShopRite supermarket at the intersection of 3rd and McConnell Streets in Stroudsburg, Pennsylvania. All of PA’s business receipts come from the operation of the Stroudsburg store.
As PA’s sole shareholder, INC appoints the PA Board of Directors. With the exception of the store manager, the PA Board is comprised of INC officers or employees who are not compensated by PA and do not maintain an office in Pennsylvania. Board minutes and testimony from PA’s witnesses establish that regular and at least quarterly meetings of the Board of Directors are held at the Stroudsburg, Pennsylvania store.
Shortly after its inception, PA filed a Business Registration form with the State of New Jersey Division of Revenue indicating that it was doing business in New Jersey effective January 1, 2000. In the Exhibits to the Joint Stipulation of Facts moved into evidence, the form is referred to as “PA Withholding Tax Registration Form” and is signed by PA President Kevin Begley.[3]
*400 The form contains multiple contradictions with Mr. Begley’s trial testimony. The form indicates (1) PA is not a subsidiary of another corporation; (2) PA pays wages, salaries or commissions to employees working in New Jersey; (3) PA hired its first New Jersey employee on January 1, 2000 with a first wage or salary payment of January 8, 2000; and (4) PA did not acquire substantially all the assets, trade or business, or employees of a previous employing unit. PA identifies the Stroudsburg, Pennsylvania address as its business location but lists its mailing address as “733 Mountain Avenue, Springfield, New Jersey 07081.”
This Business Registration form is not the only document linking PA to the Springfield, New Jersey address. PA’s Pro Forma Federal Tax returns for fiscal years July 2003 through July 2010 declare PA’s principal office or place of business to be “733 Mountain Avenue, Springfield, New Jersey 07081.” PA’s Pennsylvania tax returns for fiscal years July 2000 through July 2010 use the Springfield, New Jersey address as its mailing address as well.

B. Village Super Market ofNJ, LP

On October 28, 1999, eight days after the formation of PA, INC and PA formed a New Jersey limited partnership known as Village Super Market of NJ, LP (“LP”) to operate the twenty-five remaining ShopRite stores in New Jersey.[4] It is undisputed that INC decided to form LP as a limited partnership to reap the benefits of lower New Jersey state taxes.
Initially, INC contributed one dollar, for a one percent general partnership interest and PA contributed ninety-nine dollars, for a ninety-nine percent limited partnership interest in LP.[5] On Janu *401 ary 1, 2000, INC contributed substantially all of the assets related to the New Jersey and Pennsylvania Shop Rite stores to PA.[6] Those assets were valued at just over $51,000,000.[7]
Immediately following the transfer from INC, PA contributed the assets of the New Jersey stores to LP. Such assets were valued at slightly more than $47,000,000.[8] At the same time, INC transferred $500,000 directly to LP.[9]
In December 2001, INC and PA amended LP’s Certificate of Limited Partnership to reduce PA’s percentage allocation of LP’s profits and losses from ninety-nine percent to ninety-four percent in exchange for a guaranteed payment. The guaranteed payment was based on a formula that multiplied an agreed upon rate of return by the value of the assets that PA had contributed to LP. Correspondingly, INC’s share increased to six percent. No new capital was placed into LP at that time.
In December 2007, INC contributed $40,000,000 cash to LP, resulting in an additional adjustment.[10] Now, INC holds approximately seventeen percent general partnership interest in LP while PA maintains a limited partnership interest of over eighty-three percent.[11]
*402 PA’s limited partnership interest in LP is PA's most substantial asset. PA’s most substantial source of income is the flow through of income generated from its limited partnership interest in LP. The chart below illustrates the percentage of assets that PA has invested in LP during the years 2002 through 2009.
[[Image here]]
As LP’s general partner, INC appoints LP’s officers. Like PA, LP’s Board of Directors is comprised of individuals who are INC employees, officers, and shareholders. LP’s primary place of business is also 733 Mountain Avenue in Springfield, New Jersey.

C. INC after the Reorganization

As part of the reorganization, both PA and LP entered into separate Administrative Services Agreements (“ASA”) with INC.[12] Under the ASA, PA and LP are contractually obligated to engage INC to provide the following services:
a. Office support, accounting and other administrative services as requested from time to time;
b. Assistance in preparing marketing and promotional materials and assistance with event planning and media coverage arrangements;
c. Maintenance of the books of account and operational records, reconciliation of all bank accounts, and preparation of monthly and annual financial statements;
d. Processing of all invoices for materials, goods, equipment and sendees from third parties;
e. Invoicing and billing of and collection of accounts receivable from customers;
*403 f. Processing of tax returns and related filings;
g. Processing of invoices for insurance premiums;
h. Assistance with operating systems, including computer hardware and software support services;
i. Certain payroll and other administrative sendees relating to personnel;
j. Human resources, benefits and other personnel functions;
k. Management, supervision and operational services; and
l. Other administrative, marketing or support services as may be agreed upon.
INC receives cost plus a six percent mark-up for providing these services. Due to the foregoing, PA and LP’s highest management position is at the individual store manager level. All district managers and supervisors are employees of INC with offices in New Jersey.
Effective January 1, 2000, PA and LP adopted a joint Cash Management Agreement (“CMA”) with INC. All three entities are parties to this contract and executed it at the same time. Both the INC resolution and the PA resolution authorizing the CMA state that it is an agreement for loans made by and among INC, LP, and PA. Paragraph 13 of the CMA provides that “the Agreement shall be construed in accordance with the laws of the State of New Jersey applicable in the case of agreements made and to be performed entirely within such state.”
Pursuant to the CMA, INC can loan funds to either PA or LP as a “parent loan” and PA and LP can make subsidiary loans to INC.[13] The principal of all loans under the CMA is payable on demand and interest is compounded daily based at an arm’s length interest rate.[14]
*404 Because INC and LP are both New Jersey entities, they have the same banking institution. The CMA authorizes a daily sweep of the LP bank account into the INC bank account. This leaves the LP bank account with a daily zero balance.[15]
PA has a bank account in Pennsylvania that is still in the name of “VILLAGE SUPER MARKET INC. T/A SHOP RITE OF EASTON” with a mailing address of 733 Mountain Avenue in Springfield, New Jersey. Cash is moved from PA’s account into INC’s New Jersey bank account approximately once per week. The store manager is not a signatory on the store’s bank account.
The end result of the CMA is that all of PA and LP’s cash is held by INC through a subsidiary loan, purportedly for the purpose of efficiency and investment. The cash transfers from LP and PA are deposited into a single INC account and disbursed from there. INC pays all of PA and LP’s bills and records these transfers as repayments against the principal balance of the subsidiary loan.
The day-to-day operations of PA’s store and the LP stores have not changed since the 1999 i’eorganization. Local operations are run by a management team consisting of a store manager, several assistant managers, and several department managers. The management team sets the store’s hours, hires and trains its employees, and prepares the employees’ work schedules.[16] The team also makes decisions regarding the promotion, demotion, and termination of employees.[17] The PA and LP employees are in different unions and have different health and pension benefits.
*405 The PA store and the twenty-five LP stores operate under the ShopRite name. The majority of the stores’ inventory is obtained from Wakefern which determines the price for most items.[18] The management team has discretion to change a price in reaction to a competitor’s price as long as the item is not advertised at a particular price in a ShopRite circular or other advertisement. The management team can set prices of goods purchased from local vendors. The team also orders inventory from Wakefern and reviews the store’s invoices or weekly reports from Wakefern and local vendors to ensure that the invoices are accurate.
Individual store managers and the respective Board of Directors make all decisions regarding significant capital expenditures. The Board of Directors approves or denies a store manager’s request. Capital expenditures required by Wakefern are automatic and do not require store manager or Board of Director action.
The leadership of INC, PA, and LP is interrelated. Six members of the Sumas family and Kevin Begley have virtual control over all three entities, comprise seven of the eleven seats on INC’s Board of Directors, and are all INC officers and employees.[19] Other than the quarterly board meetings in Pennsylvania, their time is spent working in New Jersey.
The chart provided below demonstrates the overlap of officers and Directors between INC, PA, and LP created by the INC reorganization. An “X” is provided for each organizational position that the particular person holds.
*406 [[Image here]]
Occasionally, resources are transferred between LP and PA. A PA store manager may be “re-assigned” to a LP location and viceversa. For example, the current PA store manager was originally at the PA store, then was transferred to an LP location, and has now returned to the PA store. Additionally, if a particular store is running low on an item of inventory, it can purchase more of that item from a PA or LP store that has excess inventory. Mr. Begley testified that, for example, if at Thanksgiving, PA was running low on a critical product, such as turkeys, it could purchase more turkey from an LP store, at cost, to replenish its inventory.[20]

D. INC’s Relationship with Wakefem

Wakefern is the nation’s largest, retailer-owned, committee-structured, food cooperative and it owns the ShopRite name. Forty-seven shareholders control Wakefern; each is required to contribute capital to Wakefern. The amount of such contribution is based on both the number of shareholder owned stores and the purchases generated by those stores.
INC’s 1999 reorganization did not divest INC of its shareholder status with Wakefem even though the Wakefern By-Laws provide *407 a procedure for such a transfer.[21] Since only Wakefern shareholders can operate a store as a ShopRite, and because INC is the only entity with Wakefern shareholder status, INC is the conduit between PA and LP, and the Wakefern cooperative.
While Wakefern has its own professional staff, it operates as a member owned cooperative. Due to INC’s status as a shareholder, executives spend a significant amount of time working on various Wakefern committees that oversee and direct Wakefern purchasing, merchandising, and other programs.
INC’s Chief Executive Officer, James Sumas, serves as Vice Chairman of Wakefern and is a member of the Wakefern Board of Directors. Pursuant to Wakefern’s By-Laws, a qualified Director must be “actively engaged in the operation of such Stockholder’s supermarket business.” Despite this requirement, James Sumas is not an employee, shareholder, nor officer of PA or LP.
Wakefern and its affiliates provide member stores with services including liability and property insurance, supplies, equipment, purchasing assistance, and retail technology support as well as certain accounting and administrative services. Wakefern is responsible for all of ShopRite’s television, radio, and newspaper advertisements and charges each member store for those services, as well as for the products ordered from Wakefern.
Wakefern member stores can:
1. Use the ShopRite name and trademarks;
2. Use the Price Plus card (ShopRite’s customer loyalty program);
3. Sell ShopRite private label products;
4. Access Wakefern’s nine warehouses in New Jersey and Pennsylvania;
5. Share the cost of advertising and promotions; and
6. Receive volume purchasing discounts because of the strength and size of Wakefern.
Member stores must follow Wakefern guidelines, meet specified Wakefern obligations, and make use of certain Wakefern services. *408 INC employees are responsible for making sure that all Wakefern policies, rules, regulations, and standards are followed.
Each store places orders directly with Wakefern and is required to purchase eighty-five percent of the store’s merchandise from Wakefern. Wakefern bills each store individually for the products and services used. A store manager reviews each Wakefern invoice and sends it to INC for payment. INC does not write checks to pay these invoices directly but rather uses Wakefern’s third-party service provider, Shared Financial Services (“SFS”) to pay bills drawn on a Wakefern bank account. INC also uses SFS to pay bills associated with non-Wakefern aecounts-payable such as local vendors, rent payments, payroll, and insurance. At trial, Kevin Begley testified that although each store is billed separately, on Sunday evenings he receives four e-mails from Wakefern representing net amounts due by INC, PA, and LP for merchandise and services provided by Wakefern.[22] On the following Tuesday, INC sends a single wire transfer to pay Wakefern for the balance owed by all four entities.
As a cooperative, Wakefern’s By-Law’s provide for the payment of a patronage dividend. Article XIX provides that “all Stockholders or wholly owned subsidiaries of Wakefern who purchase merchandise from Wakefern shall be ‘patrons’ thereof.” Wake-fern distributes annually a patronage dividend to each patron a share of the net earnings in proportion to the dollar volume of purchases by the stockholder from Wakefern.
Evidence submitted at tidal included INC’s FORM 10-K and Annual Report for fiscal year ending July 2010. These documents state that as of July 31, 2010, INC:
Operated a chain of twenty-six ShopRite supermarkets, twenty-five in New Jersey and one in Pennsylvania. The Company is a member of Wakefern, the nation’s largest retailer-owned food cooperative and owner of the ShopRite name____ INC has budgeted $12 million for capital expenditures in fiscal 2011____ INC is the second largest member of Wakefern and owns 14.1% of Wakefern’s outstanding stock. Wakefern distributes as a “patronage dividend” to each of its stockholders a *409 share of substantially all of its earnings in proportion to the dollar volume of purchases by the stockholder from Wakefern during each fiscal year.
PA’s Pro Forma Federal Tax returns for fiscal years July 2003 through July 2010 reflect an investment by PA in Wakefern that has increased over the years from $550,000 to $750,000. The returns also indicate the payment or credit of an annual patronage dividend from Wakefern to PA during this time.
The Annual Report also states:
1. As of October 1, 2010, INC employed approximately 4,900 persons with approximately seventy-three percent working part-time.
2. The twenty-six ShopRite stores are organized into five districts.
3. Each district has a district manager and two supervisors.
The division of the stores into districts is the same structure as before the reorganization. Bonuses and compensation of the district managers and supervisors are determined, in part, based upon the performance of the stores in their district. The district managers and supervisors provide services through the ASA and are required to manage, visit, participate, motivate, supervise, and coordinate the stores in their district.[23]
One of the five districts is designated as the Western District and consists of PA’s Stroudsburg store as well as a number of LP’s western New Jersey stores. From May 2008 to December 2011, Robert Fricke, a PA officer employed by INC, served as the Western District manager and was “managing, visiting participating, motivating, supervising, and coordinating” the stores in his district which included both the PA store and several LP stores.
II. PROCEDURAL HISTORY
The Division conducted an audit of LP for the period of January 1, 2003 through March 31, 2006. As part of the examination, the *410 auditor verified whether the distributive share of partnership income was properly reported on INC and PA’s returns. It was determined that INC had filed a New Jersey CBT return reporting the income but PA had not due to its stated “lack of presence in New Jersey.”
As a result of the audit, the Division further examined PA and issued a Formal Notice on July 15, 2008 for the period commencing November 1,1999.
PA filed a protest with the Division’s Conference and Appeals Branch on October 10, 2008. After considering the information revealed in the course of the audit and a March 10, 2010 conference, the Division determined that PA is subject to CBT pursuant to N.J.A.C. 18-7-7.6(c) 4 and N.J.A.C. 18:7-7.6(e). On October 4, 2010, the Division’s Conference and Appeals Branch issued the Final Determination upholding the determination that PA is subject to CBT but reversing the Sales and Use Tax determination.
PA filed a Complaint in the Tax Court on December 21, 2010. Trial was held on June 17, 2013 and on June 18, 2013. The court received post-trial submissions on August 29, 2013.
III. LEGAL ANALYSIS
At issue in this case is whether PA has nexus with New Jersey thereby requiring it to file CBT returns and pay CBT taxes.

A. Nexus

Under the U.S. Constitution, powers not delegated to the federal government are reserved for the States. U.S. Const. amend. X. To the extent that a State’s tax laws do not conflict with federal laws and the Constitution, the taxing rules of the State are supreme within the boundaries of the State’s taxing jurisdiction.
The power of a State to tax an out-of-state entity is found in the Due Process Clause of the Fourteenth Amendment of the United States Constitution. U.S. Const. amend. XIV, § 1. There are two requirements for such state taxation: a “minimal connec *411 tion” or “nexus” between the interstate activities and the taxing State, and “a rational relationship between the income attributed to the State and the intrastate values of the enterprise.” Exxon Corp. v. Wisconsin Dept. of Revenue, 447 U.S. 207, 219-220, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980) (citing Mobil Oil Corp. v. Commissioner of Taxes of Vt., 445 U.S. 425, 436-437, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980)).
Nexus can be established through either a transaction-based analysis (tax on an activity) or a presence-based analysis. In a transactional analysis, there must be a connection between the entity to be taxed and the activity being conducted in the taxing State. Thus, a passive investor in an unrelated business enterprise would not have transactional nexus. See Allied-Signal Inc. v. Director, Div. of Taxation, 504 U.S. 768, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992).
Regarding presence nexus, the Due Process Clause requires that a corporation have minimum contacts with the taxing State, sufficient to reasonably anticipate being hauled into court. A court must examine factors such as whether the corporation has offices, employees, or real or tangible personal property. See Lanco, Inc. v. Director, Div. of Taxation, 21 N.J.Tax 200 (2003), rev’d 22 N.J.Tax 636 (2005), aff'd 188 N.J. 380, 908 A.2d 176 (2006), cert. denied, 551 U.S. 1131, 127 S.Ct. 2974, 168 L.Ed.2d 702 (2007) . The Due Process Clause does not require physical presence but only requires that the entity purposely directs its activity into a jurisdiction. See Quill Corp. v. North Dakota, 504 U.S. 298, 306-308, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). In other words, under the Due Process Clause, a State may tax an out-of-state seller who maintains minimum contacts with that State. Ibid. The test is whether the taxing power exerted by the State bears fiscal relation to protection, opportunities, and benefits given by the State.
Additionally, the application of CBT must be in accordance with the Commerce Clause. The language of the Commerce Clause that authorizes Congress to “regulate Commerce ... among the several States,” creates a “negative” or “dormant” *412 power that prevents States from discriminating against interstate trade. Telebright Corp., Inc. v. Director, Div. of Taxation, 25 N.J.Tax 333, 349 (2010), aff'd 424 N.J.Super. 384, 38 A.3d 604 (App.Div.2012) (citing Oregon Waste Sys., Inc. v. Dep’t of Envt’l Quality, 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)). Regarding State taxation, a tax on interstate economic activity must be “applied to an activity with a substantial nexus with the taxing State, [be] fairly apportioned, ... not discriminate against interstate commerce, and ... [be] fairly related to the services provided by the State.” Telebright, supra, 25 N.J.Tax at 350 (quoting Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977)).

B. New Jersey Corporation Business Tax Act

In 1945, the New Jersey Legislature enacted the Corporation Business Tax Act (“the Act”). N.J.S.A. 54:10A-1 to -41.[24] The Act imposes a tax on a corporation “for the privilege of having or exercising its corporate franchise in [New Jersey], or for the privilege of doing business, employing or owning capital or propei’ty, or maintaining an office, in [New Jersey].” Stryker Corp. v. Director, Div. of Taxation, 168 N.J. 138, 147, 773 A.2d 674 (2001) (citing Statement to Assembly Bill No. 395 of 191-5 (L. 1945, c. 162) (quoting N.J.S.A. 54:10A-2)).
The Act is designed to reach foreign corporations engaging in interstate or intrastate business. Roadway Express, Inc. v. Director, Div. of Taxation, 50 N.J. 471, 236 A.2d 577 (1967), *413 appeal dismissed 390 U.S. 745, 88 S.Ct. 1443, 20 L.Ed.2d 276 (1968). An analysis of the case specific facts determines whether an out-of-state corporation is subject to the Act. N.J.A.C. 18:7—1.9(b).
Guidance with respect to the application of CBT to out-of-state limited partners with investments in New Jersey can be found in regulations adopted as part of the New Jersey Administrative Code. N.J.A.C. 18:7-7.6(c) states:
A foreign corporate limited partner of a limited partnership doing business in New Jersey is considered exercising its franchise to do business in this State, doing business in this State or employing capital in this State, and, therefore, is subject to tax under N.J.S.A 54:10A-2 and filing a corporation business tax return, if:
1. The limited partner is also a general partner of the limited partnership;
2. The foreign corporation limited partner, in addition to the exercise of its rights and powers as a limited partner, takes an active part in the control of the partnership business;
3. The foreign corporate limited partner meets the criteria set forth in N.J.A.C. 18:7-1.9 or 1.6; or
4. The business of the partnership is integrally related to the business of the foreign corporation.
[N.J.A.C. 18:7 — 7.6(c).]
The third prong of the regulation references N.J.A.C. 18:7-1.6(a), which provides in relevant part:
Every corporation not expressly exempted is deemed to be subject to tax under the Act and is required to file a return and pay a tax thereunder provided it falls within any one of the following ...
If a foreign corporation....
iii. Doing business in this State; or
iv. Employing or owning capital in this State; or
v. Employing or owning property in this State; or
vi. Maintaining an office in this State; or
vii. Deriving receipts from sources within this State; or
viii. Engaging in contacts within this State.
[N.J.A.C. 18:7-1.6(a)(2)(iil — viii).]
JV./.AC.18:7-1.9 further explains that:
(a) The term “doing business” is used in a comprehensive sense and includes all activities which occupy the time or labor of men for profit.
1. Regardless of the nature of its activities, every corporation organized for profit and carrying out any of the purposes of its organization within the State shall be deemed to be “doing business” for the puiposes of this Act.
*414 2. In determining whether a corporation is “doing business,” it is immaterial whether its activities result in a profit or a loss.
(b) Whether a foreign corporation is doing business in New Jersey is determined by the facts in each case. Consideration is given to such factors as:
1. The nature and extent of the activities of the corporation in New Jersey;
2. The location of its offices and other places of business;
3. The continuity, frequency and regularity of the activities of the corporation in New Jersey;
4. The employment in New Jersey of agents, officers and employees;
5. The location of the actual seat of management or control of the corporation.
[N.J.A.C. 18:7-1.9(a), (b)J
When considering the applicable statutes and regulations, the court must also consider the presumptive validity of the Director’s determinations. See Campo Jersey, Inc. v. Director, Div. of Taxation, 22 N.J.Tax 251, 270 (Tax 2005), aff'd, 390 N.J.Super. 366, 915 A.2d 600 (App.Div.), certif. denied, 190 N.J. 395, 921 A.2d 448 (2007). “New Jersey courts generally defer to the interpretation that an agency gives to a statute that agency is charged with enforcing.” Koch v. Director, Div. of Taxation, 157 N.J. 1, 15, 722 A.2d 918 (1999); See also Estate of Schinestuhl, ex rel. Acquadro v. Director, Div. of Taxation, 26 N.J.Tax 289 (Tax 2012). This court recognizes the Director’s “expertise in the highly specialized and technical area of taxation.” Aetna Burglar & Fire Alarm Co. v. Director, Div. of Taxation, 16 N.J.Tax 584, 589 (Tax 1997).
The Director’s determinations of nexus and assessment of CBT are presumptively correct and PA bears the burden of overcoming the presumption of validity. See Reck v. Director, Div. of Taxation, 345 N.J.Super. 443, 446, 785 A.2d 476 (App.Div. 2001), aff'd, 175 N.J. 54, 811 A.2d 458 (2002); Meadowlands Basketball Assoc, v. Director, Div. of Taxation, 19 N.J.Tax 85 (Tax 2000), aff'd, 340 N.J.Super. 76, 773 A.2d 1160 (App.Div.2001); T.A.S. Lakewood, Inc. v. Director, Div. of Taxation, 19 N.J.Tax 131, 140 (Tax 2000). “However, this deference is ‘not total, as the courts remain the ‘final authorities’ on the issues of statutory construction and are not obligated to ‘stamp’ their approval of the administrative interpretation.’ ” Koch, supra, 157 N.J. at 15, 722 *415 A.2d 918 (citing New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 575, 384 A.2d 795 (1978)).
PA asserts that its limited partnership interest in LP is not enough to subject PA to CBT because it is strictly a passive investor. PA argues that it is like the taxpayer in BIS LP, Inc. v. Director, Div. of Taxation, 25 N.J.Tax 88 (2009), aff'd., 26 N.J.Tax 489 (App.Div.2011), certif. granted, 27 N.J.Tax 58 (2012) in that PA’s limited partnership interest in LP is insufficient to create nexus with New Jersey. PA claims that the only potential difference between PA and the taxpayer in BIS, supra, is that PA operates a ShopRite store in Pennsylvania.
In BIS, the parent company, BISYS, and its wholly owned subsidiary, BIS, supra, formed Solutions as a New Jersey limited partnership. Id. at 92. BISYS contributed ninety-nine percent of its banking information assets to BIS and one percent of its banking information assets to Solutions. BIS subsequently contributed all of the assets it received from BISYS to Solutions. Following those transfers to Solutions, BISYS became a general partner with a one percent interest in Solutions and BIS became a limited partner with a ninety-nine percent interest in Solutions. Once the restructure was complete, BIS was no longer involved in the banking information business.
BIS did have the right to inspect documents. Additionally, the limited partnership interest in Solutions was BIS’s most substantial asset, and it produced most of BIS’s income. However, BIS was not in the same line of business as Solutions. Nor was there a “substantial” overlapping of officers nor sharing of offices, operational facilities, technology, or know-how. The lines that divided the entities were clean and precise.[25]
Applying the law to the facts in this matter, the court finds that PA’s interactions with LP and its interactions with INC establish sufficient minimum contacts to meet the requirement of presence based nexus with New Jersey.
*416 PA’s interstate activities can be summarized in three identifiable areas: (1) physical presence in Springfield, New Jersey; (2) contractual presence through the CMA; and (3) correlating business interests.
PA’s official documents and business records are kept at the INC business offices in Springfield, New Jersey. PA’s tax returns and bank statements identify the Springfield, New Jersey address as PA’s address. PA’s New Jersey Registration form indicates that there are persons working in New Jersey on behalf of PA. With the exception of the store manager, all of PA’s officers and directors work out of the Springfield, New Jersey office and only make occasional visits to the Stroudsburg, Pennsylvania store.
The CMA is governed by New Jersey law and was executed by and between PA, LP, and INC. The net result is that all of PA’s cash assets are held in New Jersey as a subsidiary loan to INC. The substantial interest income generated as a result of these loans remains in New Jersey because it is added to the principal balance of the loan and not paid out to PA.
Finally, the notion that PA is a separate, distinct, and independent business from LP or INC is neither credible nor supported by the facts. This court cannot find any difference in the operations of the supermarket stores before or after the 1999 reorganization. The formation of the separate business entities of PA and LP appear to simply be a guise created for the purpose of tax avoidance. The reality is that due to the Wakefern structure and INC’s shareholder status, all of the entities are involved in the supermarket business, are interrelated, and are interdependent. The tax returns are separate and discreet, but not much else is.
PA’s presence in the INC western district with New Jersey ShopRite supermarkets is particularly revealing. The inclusion of stores from both entities, overseen by a manager and supervisors whose income is affected by the performance of the district, lends itself to a sharing of the resources and information of all three entities. This is enhanced by the fact that there is a substantial overlap of the officers and directors of INC, PA, and LP. Two of *417 LP’s three officers are both officers and directors of PA. All four of PA’s directors also serve on INC’s Board of Directors.
Furthermore, PA receives income in the form of a patronage dividend based upon a percentage of Wakefern’s earning in relation to store purchases. The only entitlement to this patronage dividend is through INC and its shareholder status with Wake-fern. INC’s CEO, James Sumas, represents that, for tax purposes, INC, PA, and LP are separate and distinct and INC is out of the day-to-day operations of the supermarket business. On the other hand, to Wakefern, he represents that he is actively involved in the supermarket business, thus qualifying him to be a Director and Vice-Chairman of Wakefern.
The second requirement to justify the taxation of an out-of-state entity is that there must be a rational relationship between the income attributed to New Jersey and the values of the enterprise. PA’s stream of income ean be divided into four categories: (1) business receipts; (2) LP limited partnership investment income; (3) interest income on subsidiary loans; and (4) patronage dividends.
PA’s business receipts are limited to the state of Pennsylvania and are consequently irrelevant. The investment income from PA’s limited partnership in LP does however bear a rational relationship to New Jersey by virtue of the overlap of officers and directors, the commonality of the business enterprises and their unification in INC’s western district, and the execution of a joint CMA with LP and INC.
Also flowing from the CMA is PA’s interest income on subsidiary loans to INC. The CMA is governed by New Jersey law and permits INC to hold and control all of PA’s cash assets. The patronage dividends are also generated in New Jersey and, although they are based upon PA’s purchases made for sales in Pennsylvania, PA’s entitlement to the dividend is derived from INC’s shareholder status.
IV. CONCLUSION
Despite the fact that it is an out-of-state limited partner in a New Jersey limited partnership, PA is completely distinguishable *418 from BIS. The lines between PA, INC, and LP are blurred, not separate and distinct. There is little doubt that they are all in the same line of business, interdependent upon one another, and are being operated in exactly the same manner that they were prior to the restructure.
INC’s shareholder status with Wakefern defines the PA and LP stores and unifies them as one entity under INC for which they receive and are entitled to benefits derived from Wakefern. The integration of officers, shareholders, and directors who all operate out of New Jersey supports the proposition that, at the very least, PA has agents in New Jersey who control and manage it from their offices in Springfield, New Jersey.
Furthermore, PA’s identity and existence as a ShopRite is entirely dependent upon its relationship to Wakefern through shares of stock held by INC in New Jersey. Without this connection to New Jersey, PA’s entire business model would cease to exist.
In sum, this court holds that PA and LP are not discreet and independent entities because they are in the same line of business, are both parties to the same New Jersey-governed CMA, have common agents, managers, officers, and directors upon whom they are dependent upon to operate as ShopRite stores, and share a principal place of business in Springfield, New Jersey. The court affirms the Director’s determination of nexus. Accordingly, PA is subject to CBT pursuant to N.J.S.A. 54:10A-1 for the period of October 28,1999 to the present.
The court will issue a final order of judgment enumerating its above decision.
*419 APPENDIX — ORGANIZATIONAL CHART
[[Image here]]

 According to the Wakefern Stockholder’s Agreement dated August 20, 1987 and the Wakefern By-Laws through April 25, 2013, Wakefern is a New Jersey corporation with its principal offices located in Keasbey, New Jersey. Wakefern is operated on the cooperative plan and the stockholders are retail merchants primarily dealing in consumer products for home use and deriving mutual economic and merchandise assistance from Wakefern.

 Although the papers filed by the parties refer to "Shop-Rite” as the trade name, the court will use the spelling that appears in the Wakefern corporate documents.

 Some of the employees working at the Stroudsburg store reside in New Jersey, which is not unusual due to Stroudsburg’s close geographical proximity *400 to New Jersey. PA would have had to register in New Jersey for the purpose of withholding taxes for Stroudsburg store employees residing in New Jersey.

 During the years at issue, LP has operated between twenty-two and twenty-six ShopRite stores in New Jersey with approximately 5,000 employees.

 See Appendix for an organizational chart of current ownership interests of Wakefern, INC, PA, and LP.

 The real estate owned by INC, which consisted of five store locations in New Jersey, was not included in the transfer of assets. INC subsequently leased those properties to LP at arms-length rents.

$51,009,745.

 $47,302,928.

 Prior to January 1, 2000, PA and LP did not conduct any operations or earn any income because PA and LP did not have any assets other than the initial capital contributions.

 It is noted that each of INC’s four transfers that comprised the forty million dollars was returned to INC on the same day as part of INC’s Cash Management Agreement with LP.

 Specifically, INC holds a 16.67% general partnership interest in LP. PA holds an 83.33% limited partnership interest in LP.

 Only the ASA between PA and INC was provided to the court.

 As of July 26, 2008, INC owed PA $5,130,229 and LP $78,806,154 in repayment of subsidiary loans. Interest on the loans is not paid in cash and instead an increase to the specific loan account is recorded. There does not appear to be any effort or concern on the part of PA or LP that these loans be repaid.

 The loans have similar terms and conditions as revolving loans between unrelated third parties. The transfer of cash accounts into a bank account managed by INC increases the balance of the intercompany loan from PA or LP to INC. INC’s transfer of funds to satisfy its accounts payable decreases the balance of the intercompany loan from PA or LP to INC. All cash sweeps and payments are reflected on each entity's respective loan account balances. Al *404 though INC may advance funds to PA or LP under the CMA, no such loans have occurred.

 Although the CMA refers to these loans as "subsidiary” loans, LP is not a subsidiary of INC.

 The majority of employees are part-time.

 The employee handbook and other training materials are prepared by INC in conjunction with Wakefern policies and are distributed to both PA and LP employees.

 The benefits of Wakefern pricing are not dependent on the number of stores that a shareholder owns. Wakefern charges each member the same price for its goods and services.

 Mr. Begley is a C.P.A. and, since 1987, has been employed by INC where he also serves as CFO and Treasurer. Mr. Begley oversees INC's accounting and financial matters, including its public recording requirements and he supervises the accounting staff. Mr. Begley is not employed by PA, but serves as PA's President and CEO. He has served in this capacity since PA's inception in 1999. Mr. Begley is not employed by LP, but has served as LP's CFO since its inception in 1999. He has no specific job responsibilities at PA or LP, though he monitors their activities and provides services through the ASA.

 Mr. Begley testified that "if they can’t get product from Wakefem quicker, or from another source, they can ask their district manager if he can get it from an LP store."

 Section Nine of the By-Laws allows for the permissive Transfer of Stock, upon approval of the Board of Directors to an acquiring party who is not an Unqualified Successor.

 There is now an additional entity operating in Maryland known as Village Super Market of Maryland, LLC ("MD”). MD owns and operates two Maryland stores, one in Silver Spring, Maryland and the other in Timonium, Maryland.

 The district managers and supervisors provide advice and assist in problem solving, provide a point of contact for the stores regarding the services provided under the ASA and generally ensure that each store is run efficiently, safely, and profitably. As an incentive to increase the profitability of each store, which increases INC's return on its investments in PA, LP, and MD, the district managers’ compensation is based in part on the financial performance of the stores in the manager’s district regardless of the legal entity that owns the stores.

 The Corporation Business Tax Act provides as follows:
Every domestic or foreign corporation which is not hereinafter exempted shall pay an annual franchise tax for each year, as hereinafter provided, for the privilege of having or exercising its corporate franchise in this State, or for the privilege of deriving receipts from sources within this State, or for the privilege of engaging in contacts within this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State.... A taxpayer's exercise of its franchise in this State is subject to taxation in this State if the taxpayer's business activity in this State is sufficient to give this State jurisdiction to impose the tax under the Constitution and statutes of the United States.

 Although referenced in BIS, the Unitary Business Principle is irrelevant to this court’s determination of nexus.